USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2285 IN RE SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION PASQUALE MASSARO, ET AL., Appellants, v. STANLEY CHESLEY, ET AL., Appellees.  ____________________ No. 96-1142 IN RE SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION RICHARD BIEDER, ET AL., Appellants, v. STANLEY CHESLEY, ET AL., Appellees.  ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, Senior U.S. District Judge] __________________________  ____________________ Before Selya, Cyr and Lynch, Circuit Judges. ______________  ____________________ Judith Resnik, with whom Dennis E. Curtis, Richard A. Bieder, _____________ _________________ __________________ Koskoff, Koskoff & Bieder and Jos E. Fernandez-Sein were on brief for _________________________ ______________________ appellants. Will Kemp, with whom Harrison, Kemp & Jones, CHTD was on brief _________ _____________________________ for appellees.   ____________________ April 22, 1997  ____________________ 2 CYR, Circuit Judge. Plaintiffs and their counsel CYR, Circuit Judge. ______________ appeal from a district court order awarding the Plaintiffs' Steering Committee ("the PSC") approximately $10,670,000 for costs incurred in representing plaintiffs in this mass-tort litigation. We affirm the district court order in substantial part and direct appellees to remit $1,023,903 ($913,503 in PSC "expert" fees, and $110,400 in photocopying charges). I I BACKGROUND1 BACKGROUND __________ Ninety-seven people perished in a tragic New Year's Eve fire at the San Juan Dupont Plaza Hotel on December 31, 1986, and many others sustained serious personal injuries and property losses. After thousands of individual plaintiffs filed hundreds of claims against a host of defendants in many different juris- dictions ("multidistrict litigation" or "MDL"), the Judicial Panel on Multidistrict Litigation consolidated all cases for trial in the United States District Court for the District of  ____________________ 1We relate only the record facts directly material on 1 appeal. The following cases offer the hardy reader a more complete history of these marathon proceedings at the appellate level. See In re Three Additional Appeals Arising Out of the San ___ _____________________________________________________ Juan Dupont Plaza Hotel Fire Litig., 93 F.3d 1 (1st Cir. 1996); ____________________________________ In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza _________________________________________________________________ Hotel Fire Litig., 56 F.3d 295 (1st Cir. 1995); In re San Juan __________________ _______________ Dupont Plaza Hotel Fire Litig., 45 F.3d 569 (1st Cir. 1995); In _______________________________ __ re San Juan Dupont Plaza Hotel Fire Litig., 45 F.3d 564 (1st Cir. __________________________________________ 1995); In re Two Appeals Arising Out of the San Juan Dupont Plaza __________________________________________________________ Hotel Fire Litig., 994 F.2d 569 (1st Cir. 1993); In re San Juan __________________ ______________ Dupont Plaza Hotel Fire Litig., 989 F.2d 36 (1st Cir. 1993); In _______________________________ __ re Nineteen Appeals Arising Out of the San Juan Dupont Plaza _________________________________________________________________ Hotel Fire Litig., 982 F.2d 603 (1st Cir. 1992); In re San Juan __________________ ______________ Dupont Plaza Hotel Fire Litig., 907 F.2d 4 (1st Cir. 1990); In re ______________________________ _____ San Juan Dupont Plaza Hotel Fire Litig., 888 F.2d 940 (1st Cir. ________________________________________ 1989). 3 Puerto Rico (Acosta, J.), see 28 U.S.C. 1407.  ___ As most plaintiffs had already retained their own counsel (hereinafter: "individually retained plaintiffs' attor- neys" or "IRPAs"), the district court recognized the need to coordinate their representation through the PSC. Eventually comprised of eleven attorneys with expertise in mass-tort litiga- tion, the PSC served as plaintiffs' lead counsel, responsible for coordinating discovery, settlement negotiations and, if neces- sary, trial matters common to all plaintiffs. The eleven PSC members nonetheless retained their respective roles as IRPAs, directly representing approximately seventy percent of the individual plaintiffs. The IRPAs, on the other hand, were to focus their efforts on litigation tasks idiosyncratic to their respective clients' cases.  A. Pretrial Case-Management Orders A. Pretrial Case-Management Orders _______________________________ In two pretrial orders, the district court directed plaintiffs, who would derive common benefit from PSC services, to pay PSC attorney fees and costs from the common fund ultimately recovered in the litigation. See Pretrial Order No. 127 (Dec. 2, ___ 1988); Pretrial Order No. 2 (Mar. 23, 1987). At the time, the district court tentatively proposed to limit the PSC to a com- bined attorney fee/cost award not exceeding ten percent of the eventual common fund, see Pretrial Order No. 127, at 48, which ___ ultimately approximated $220 million. The district court estab- lished the following cost-submission and reimbursement guide- 4 lines: [A]ssessments2 will be deposited in a fund that will defray the reasonable expenses of the PSC in the performance of its duties. The PSC shall maintain a careful statement of account on the fund, that is, prepare and keep accurate, contemporaneous, detailed ________ _______________ ________ records of the receipts, deposits, accumu- _______ ________ lated interest and subsequent disbursements. The fund shall be used only to make disburse- ments (whether directly to creditors or to reimburse the PSC) for expenses incurred for the benefit of all plaintiffs. Any disburse- ments made for the benefit of a particular plaintiff represented by a member of the PSC shall be the sole responsibility of the plaintiff in question. The PSC shall be authorized to periodically expend monies from the fund as needed to defray the necessary _________ "hard" costs of its work, such as office overhead, staff salaries, warehousing, dupli- cation, expert fees, deposition costs, etc. The members of the PSC shall be reimbursed from time to time for the "hard" expenses of the PSC-related work incurred by them or their employees/appointees, provided they submit to the PSC careful, contemporaneous, _______ _______________ detailed records of their expenditures.  ________ _______ "Soft" costs such as travel, meals, transportation, lodging, etc., shall be borne by the individual PSC members who shall be reimbursed at the conclusion of this litiga- tion or as otherwise provided by the Court. All persons interested in reimbursement, particularly members of the PSC, must keep careful, contemporaneous, detailed records of _______ _______________ ________ _______ individual expenses. Only reasonable and __________ necessary expenses will be reimbursed. For _________ example, airplane/transportation expenses should be at economical rates, not first class; and hotel accommodations/meals should be moderate, not deluxe, etc. Reimbursements ________ ___ ______ are conditioned, of course, on the proper ______  ____________________ 2As commonly occurs in mass-tort MDLs, plaintiffs' attor- neys, inter alios, were required to advance and pool the monies _____ _____ needed to fund their clients' litigation, including the interim- cost petitions filed by the PSC and its members. See Pretrial ___ Order No. 127, at 37-43. Reimbursement for their advances were contingent upon their recoveries from defendants.  5 verification of expenses. ____________ The PSC and/or its members, as perti- nent, shall submit to the Court for its ap- ___ ___ ___ proval a statement for reimbursable "hard" ______ expenses and another for "soft" expenses as well as statements of account beginning on August 1, 1987 and every sixty (60) days _____ _____ ____ thereafter. Id. at 44-45 (emphasis added). See also Pretrial Order No. 2, at ___ ___ ____ 14.  B. The PSC-Office Cost Regimen  B. The PSC-Office Cost Regimen  ___________________________ Although individual PSC members performed some PSC litigation tasks through their individual law firms, the district court also authorized the PSC to recover its direct costs in establishing, staffing, and operating a centralized PSC Office (hereinafter: "PSC-Office costs"). Further, the PSC bylaws required prior approval, by five PSC members, for any PSC-office cost reimbursement above $500, as well as payment of such costs by PSC check. In March 1987, certified public accountant ("CPA") Donald Kevane was retained to review and submit to the PSC monthly reports summarizing PSC-office costs. In February 1991, the PSC submitted its final report to the district court, claim- ing $6,956,368 in PSC-office costs attributable to Phases I and II of the litigation.3  ____________________ 3Phase I involved liability claims against the hotel and its affiliates, whereas Phase II involved claims against the suppli- ers of goods and services to the hotel. The district court has yet to rule on attorney fees and costs attributable to Phase III, which allocated liability among defendants' various insurers. See In re Nineteen Appeals, 982 F.2d at 608-10 (determining that ___ ______________________ Phase I and II cost awards were final, appealable orders). 6 C. The PSC-Member Cost Regimen  C. The PSC-Member Cost Regimen  ___________________________ Similarly, the district court authorized reimbursements of costs incurred by the eleven individual PSC members in per- forming PSC litigation tasks (hereinafter: "PSC-member costs"), as distinguished from their respective duties as IRPAs. Every sixty days, the PSC submitted, under seal and "for [court] ap- ___ ___ proval," a consolidated report summarizing each PSC member's ______ individual "hard" and "soft" costs. (Emphasis added.)4  In September 1989, the district court appointed C. Terry Raben, a CPA, to "review the [PSC-member cost] information supplied to . . . date to ensure it is complete, accurate and ________ ________ contemporaneous[,] as well as to organize the reports before the _______________ sheer number of them unduly complicates any reasonable accounting procedures." Order No. 222 (docket No. 12671, entered under seal Sept. 15, 1989). Raben previously had performed comparable cost oversight responsibilities in another mass-tort litigation. See ___ generally In re MGM Grand Hotel Fire Litig., 660 F. Supp. 522 (D. _________ _________________________________  ____________________ 4On July 2, 1987, the district court approved PSC bylaws. Article XI, entitled "Accounting and Expense Management," provid- ed, inter alia, that: (1) all PSC members were to "insure the _____ ____ exact and efficient management of plaintiffs' resources by strictly complying with proper accounting and expense management principles . . . [as] set forth in the Orders of the Court, in the Manual for Complex Litigation, and herein," id. 11.01 _______________________________ ___ (emphasis added); (2) PSC members were to submit to the PSC secretary every 60 days a standardized form listing their total costs, broken down into ten broadly enumerated categories (e.g., ____ "air travel," "hotels and meals"), id. 11.02, 11.03 & 11.05; ___ (3) the PSC Secretary was to consolidate these member reports for submission to the district court, with the individual members' summary reports attached, id. 11.04; and (4) the PSC Secretary ___ would nominate an auditor for appointment by the court, id.  ___ 11.07. 7 Nev. 1987) (or "the MGM case"). The district court directed ___ Raben to scrutinize the PSC files for compliance with the crite- ria in Pretrial Order No. 127, supra, to obtain any additional _____ documentation deemed appropriate, and submit findings to the court.  In November 1990, almost four years into these proceed- ings, the PSC became concerned that outside accountants like Raben, who were not attorneys and lacked intimate knowledge of the PSC's litigation responsibilities and inner workings, might not adequately appreciate whether PSC-member cost claims met the compliance criteria prescribed in Pretrial Order No. 127. Accordingly, the PSC directed Monita Sterling, a paralegal for a PSC-member law firm with prior exposure to PSC litigation tasks, to review each PSC-member cost claim independently to determine whether the expenditures were "necessary" to legitimate PSC litigation tasks, "reasonable" in amount, and not duplicative of other PSC-member cost claims. Sterling thereafter reviewed "every receipt or other piece of documentation submitted," noting each questionable claim.5 Sterling submitted her reports and  ____________________ 5Sterling, who had acquired extensive prior experience in the MGM case, established eleven criteria for determining whether ___ PSC-member costs were reimbursable: (1) major expenditures only if documented by receipts; (2) minor expenditures (e.g., tips, ____ pay-phone charges), for which the use of receipts was impractica- ble, only if supported by affidavit; (3) coach air fare only; (4) federal express charges if documented by airbills designating origin and destination; (5) long distance phone charges if documented according to date, number, duration, and cost; (6) photocopying expenditures at 25 cents per page and postage charges at actual cost if the member indicated compliance with normal in-house procedure at the member's law firm for tracking these costs; (7) telefax charges at actual cost, not at a page 8 supporting documentation to Adamina Soto, a CPA who reviewed the Sterling report and randomly checked its underlying documenta- tion, then contacted PSC members about problem items and request- ed further documentation. Soto eventually disallowed $207,475 in costs and submitted her reports to Raben. Raben submitted three final reports to the district court, covering PSC-member cost claims through January 31, 1991.6 He disallowed an additional $138,569 of the total $3,847,233 in claimed expenditures. The district court approved each Raben report as submitted. See In re San Juan Dupont Plaza Hotel Fire ___ _______________________________________ Litig., 768 F. Supp. 912, 934 (D.P.R. 1991), vacated on other ______ _______ __ _____ grounds, 982 F.2d 603 (1st Cir. 1992). PSC members ultimately _______ recovered $3,708,665. Id. ___ D. Attorney Fee/Cost Rulings D. Attorney Fee/Cost Rulings _________________________ In February 1991, the PSC submitted its final applica- tion for cost reimbursements, attaching the report previously prepared by Donald Kevane and requesting $6,956,368 in PSC-office costs attributable to Phases I and II. See supra p. 6. Three ___ _____ months later, the district court abandoned its earlier tentative  ____________________ rate; (8) secretarial expense if specifically authorized by the PSC; (9) costs relating to equipment placed at the PSC Office for use by PSC staff; (10) no reimbursement for court-ordered mone- tary sanctions imposed on the PSC; and (11) duly authorized miscellaneous costs only if "reasonable and necessary in the prosecution of the case, . . . for the benefit of the PSC and the plaintiffs as a whole, and not for individual clients."  6These reports were dated: March 13, 1990 (costs from January 1987 to September 1989); October 12, 1990 (costs from October 1989 to March 1990); and February 20, 1991 (costs from April 1990 to January 1991). 9 proposal, see supra p. 4, to limit the PSC's combined attorney ___ _____ fee/cost award to ten percent of the common fund. Thereafter, the court approved the entire PSC fee/cost application. See ___ Order No. 346 (June 21, 1991).  10 On appeal, we vacated the fee/cost award for failure to afford the plaintiffs and IRPAs a meaningful opportunity to chal- lenge the PSC attorney fee application on the merits. According- ly, we remanded for further proceedings. See In re Nineteen ___ _______________ Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire _________________________________________________________________ Litig., 982 F.2d 603, 608, 615-16 (1st Cir. 1992) [hereinafter ______ "Nineteen Appeals"]. Following the remand and a second appeal, ________________ the PSC and IRPAs were directed to share the available attorney- fee fund ($68 million) equally. See In re Thirteen Appeals Aris- ___ ____________________________ ing Out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d ________________________________________________________ 295, 312 (1st Cir. 1995) [hereinafter "Thirteen Appeals"].  ________________ Following the remand in Nineteen Appeals, the district ________________ court separately reconsidered the PSC application for costs, fixing March 12, 1993, as the deadline for the plaintiffs and IRPAs to submit "specific/detailed written objections" to all PSC-cost submissions through January 31, 1991. See Order No. 478 ___ (Jan. 15, 1993). The court further directed three categories of documents to be filed in the joint document depository ("JDD") for review by the plaintiffs and IRPAs: (1) the three Raben reports analyzing PSC-member costs; (2) the Kevane monthly reports summarizing PSC-office costs; and (3) the PSC-member cost documentation. See Order No. 479 (Jan. 20, 1993). Although the ___ court rejected a request by the plaintiffs and IRPAs for addi- tional formal discovery, see Thirteen Appeals, 56 F.3d at 303 ___ _________________ (noting that mandated exchanges of documentation, rather than "searching discovery," are appropriate where only attorney fees 11 and expenses are at issue), it ordered both Raben and Kevane to submit descriptions of their auditing procedures and directed Kevane to produce his working papers, correspondence, and docu- mentation. See Order No. 485 (Mar. 3, 1993). ___ Within the extended deadline for further objections to costs, the plaintiffs and IRPAs submitted a report and affidavit by William Torres, a CPA newly retained to audit the PSC-cost submissions, attesting that he had requested the PSC to "provide [him] with access to all of the records documenting the costs incurred in this case, . . . including but not limited to, original bills or statements kept by the PSC staff or any PSC member, and any summaries or supporting documentation (including charge account bills) of the same." Even though necessary to a "meaningful analysis," Torres attested, the PSC failed to provide the requested documents, including the Raben working papers; and, until March 10, 1993, the "critical" Kevane working papers were not made available; many documents made available were unread- able; the PSC did not allow access to the PSC-member-cost-reim- bursement policies or the PSC-policy meeting minutes relating to cost reimbursements; and, finally, the PSC refused to permit him to depose Raben, Kevane or any PSC member regarding questionable cost submissions or documentation.  On November 24, 1993, the district court overruled most major objections to the PSC-cost submissions. See Order No. 510- ___ A. For example, as regards hotel charges, the court rejected the contention that the maximum per diem rate should be $116, the 12 rate considered "reasonable" by the IRS for tax-deduction purpos- es. It ruled that reasonableness must be assessed case by case, to reflect such variants as locale, seasonal fluctuations, room availability, the number of persons sharing a room, accessibility of equipment and facilities essential to the litigation task at hand, as well as other exigencies. Id. at 7-8. The court ruled ___ that, like the IRPAs, PSC members were entitled to "reasonable" reimbursement for photocopying costs and had not "profit[ed]" from the authorized twenty-five-cents-per-copy rate. Id. at 9.  ___ The district court further noted, inter alia, that the _____ ____ objections the plaintiffs and IRPAs made to the PSC-cost submis- sions were so voluminous and entwined with issues relating to attorney fees that it was difficult to determine the particular costs to which the plaintiffs and IRPAs were objecting. It directed the plaintiffs and IRPAs to "sort out this chaos," id. ___ at 12; Torres and Sterling to meet and consult at the JDD not later than December 10; and the plaintiffs and IRPAs to file particularized objections to the remaining expenditures not later than January 12, 1994.  The district court conducted an evidentiary hearing in December 1993, to determine whether to allow the PSC to recover its final cost installment for retaining Thomas Foulds, Esquire, as an expert. The PSC maintained that Foulds, who had worked for many years in the insurance industry before attending law school, had been retained as an insurance expert, to interpret insurance _________ ______ contracts, rather than as an attorney, and that his fee therefore 13 was fully reimbursable as a PSC-office cost. See Pretrial Order ___ No. 127, at 48. Although the plaintiffs and IRPAs objected that Foulds had performed many litigation tasks, including legal research and conducting depositions, normally performed by attor- neys and not by insurance experts, the district court allowed the Foulds fee reimbursement as a PSC-office cost after concluding that Foulds "was not contracted merely as an attorney" but primarily for his insurance expertise. See Order No. 520, at 3-4 ___ (Jan. 28, 1994). The final installment brought the total Foulds- fee reimbursement to $913,503.7 The plaintiffs and IRPAs filed their final objections to PSC-member costs in January 1995, essentially reiterating that the cost review and verification process had proven hopelessly inadequate to document either the necessariness or reasonableness of the claimed costs, and that it was unfair to require them to sort through the chaotic documentation created by the PSC and its members. Alternatively, the plaintiffs and IRPAs asserted specific objections to a sampling of allegedly inappropriate PSC- member costs (e.g., phone calls, tips, charges for "drinks," ____ etc.) and urged an across-the-board reduction of all PSC-cost claims by a fixed percentage (25-33%) to reflect the sampling- based estimate of alleged PSC overcharges. Finally, the plain-  ____________________ 7The district court had approved two prior PSC reimburse- ments relating to Foulds, totaling $850,000. See Margin Order ___ No. 755 (filed under seal Dec. 27, 1990); Order No. 398 (filed under seal Oct. 15, 1991). The final PSC installment of $84,107 was disallowed in part, due to deficiencies in contemporaneous documentation. 14 tiffs and IRPAs complained that Monita Sterling had refused to allow CPA Torres to inspect the documentation pertaining to PSC- office costs at the joint meeting required by Order No. 510-A. The district court once again overruled the bulk of the objections. See Order No. 584 (Aug. 29, 1995). First, it found ___ the PSC review process adequate, noting that it had resulted in disallowance of several questionable expenditures based on the independent review conducted by Raben, Sterling, and Soto under objective criteria. Second, except for a handful of de minimis __ _______ mischarges totaling less than $2,000, the court rejected the specific challenges asserted by the plaintiffs and IRPAs based on their samplings of alleged overcharges. Finally, the court ruled that its Pretrial Order No. 510-A, see supra pp. 11-12, had envi-  ___ _____ sioned only that Sterling and Torres inspect documentation relating to "outstanding issues" those involving PSC-member costs, not PSC-office-cost issues.  In due course, the plaintiffs and IRPAs [hereinafter: "appellants"] appealed from the various orders approving PSC-cost reimbursements (Order Nos. 478, 485, 510-A, 520, and 584). II II DISCUSSION DISCUSSION __________ A. The PSC-Cost Reimbursement Regimen  A. The PSC-Cost Reimbursement Regimen  __________________________________ 1. Appellants' Position 1. Appellants' Position ____________________ Appellants aim their main broadside at the regimen established for documenting, monitoring, submitting, and approv- ing PSC costs. Although the PSC, IRPAs, and plaintiffs in mass- 15 tort MDLs share the same litigation goal (viz., an optimum common ____ fund), internecine differences as to subsidiary matters  particularly the appropriate allocations from the common fund for their respective attorney fees and costs are commonplace. The greater the attorney fees and costs awarded the PSC, of course, the less available for the IRPAs and their individual clients. Appellants maintain that these conflicting self-interests neces- sarily entail heightened oversight responsibilities on the part of the district courts in mass-tort MDLs to ensure stringent monitoring and review procedures adequate to protect the individ- ual plaintiffs and IRPAs from overreaching by the PSC.  Appellants fault the district court for adopting reimbursement procedures which delegate important judicial oversight responsibilities to auditors appointed either by the court or the PSC. It is the PSC, they say, rather than the appellants, which must bear the ultimate burden in establishing entitlement to reimbursement, see Grendel's Den, Inc. v. Larkin, ___ ___________________ ______ 749 F.2d 945, 956-57 (1st Cir. 1984), which in turn necessitates three distinct showings by the PSC for each claimed reimburse- ment; viz., that it document: (i) the actual expenditure; (ii) ____ ______ ___________ its necessariness to the assigned litigation task; and (iii) its _____________ reasonableness, see, e.g., In re Agent Orange Prod. Liab. Litig., ______________ ___ ____ _____________________________________ 611 F. Supp. 1296, 1314 (E.D.N.Y. 1985) ("Expenses must be both reasonable in amount and reasonably related to the interests of the class."), aff'd in pertinent part, 818 F.2d 226, 238 (2d Cir. _____ __ _________ ____ 1987).  16 Appellants contend that the Raben and Kevane "audits" did not inform the district court adequately regarding potential PSC excesses. Raben and Kevane were accountants, neither trained in the law nor familiar with the litigation tasks assigned to the PSC. At best they could verify that the PSC and its members actually made the claimed expenditures, but in many instances PSC members maintained no detailed records relating to their reason- ableness and necessariness. Moreover, appellants argue, though Monita Sterling and others similarly designated by the PSC undoubtedly were more familiar than Kevane and Raben with the nature and demands of the PSC's litigation responsibilities, their assessments of claimed expenses were inherently biased because their employment with the PSC gave them a vested interest in justifying PSC reimbursements. Appellants contend that the district court erred in suggesting that it was incumbent upon them, rather than the PSC, to demonstrate that particular PSC expenditures were not reim- bursable. See, e.g., Order No. 520, at 1 n.1 ("Parties question- ___ ____ ing payments previously approved carried the burden of setting them aside whereas the PSC/Mr. Foulds were required to justify the pending request."). The court based its ruling on the ground that most PSC cost-reimbursement claims during earlier stages in the litigation had been approved, without opposition, as submit- ted.  Appellants complain not only that the district court thereby subverted the well-established burden of proof incumbent 17 upon the PSC, see Grendel's Den, 749 F.2d at 956-57, but foisted ___ _____________ on the plaintiffs and IRPAs the impracticable task of rummaging through mountainous PSC documentation to determine within very restrictive court-ordered deadlines which PSC-cost submissions were either inadequately documented or otherwise nonreimbursable. Appellants therefore urge that all otherwise allowable PSC-cost reimbursements be reduced by a fixed (if somewhat arbitrary) discount (25% to 33%), see, e.g., Mokover v. Neco Enters., Inc., ___ ____ _______ __________________ 785 F. Supp. 1083, 1093-94 (D.R.I. 1992), to reflect the likely extent to which the PSC inferably overcharged due to its failure to maintain "appropriate" documentation.  2. Standard of Review 2. Standard of Review __________________ District court orders awarding costs normally are reviewed only for abuse of discretion. See Grendel's Den, 749 ___ _____________ F.2d at 950; see also Anderson v. Secretary of Health & Human ___ ____ ________ _____________________________ Servs., 80 F.3d 1500, 1507 (10th Cir. 1996); National Info. ______ ______________ Servs., Inc. v. TRW, Inc., 51 F.3d 1470, 1471 (9th Cir. 1995); ____________ _________ Estate of Borst v. O'Brien, 979 F.2d 511, 517 (7th Cir. 1992) ________________ _______ ("The award of costs 'is the type of discretionary ruling to which appellate courts should give "virtually complete" defer- ence.'") (citations omitted).  3. "Burdens of Proof" 3. "Burdens of Proof" ________________ The PSC and its members undoubtedly must establish their entitlement to reimbursement. See Grendel's Den, 749 F.2d ___ _____________ at 956-57. Furthermore, there can be no quarrel that the respec- tive self-interests of the plaintiffs, the IRPAs, and the PSC in 18 mass-tort MDLs often diverge, nor for that matter that the cost- containment regimen initiated at the outset in this case (without benefit of hindsight) ultimately proved inadequate and even chaotic, see supra Section I.D, as the district court itself ___ _____ acknowledged several years later. We nevertheless part company with appellants' conten- tion that the belatedly perceived shortcomings in the adopted safeguards against PSC overreaching proximately caused the ______ unsatisfactory regimen in this case, or that the PSC and its members must therefore be required to bear the entire brunt of its failure to function as envisioned by the district court. Quite apart from formal burdens of proof, all litigants must share in their mutual obligation to collaborate with the district court ab initio in fashioning adequate case management and trial __ ______ procedures, or bear the reasonably foreseeable consequences for their failure to do so. See, e.g., Reilly v. United States, 863 ___ ____ ______ _____________ F.2d 149, 160 (1st Cir. 1988) (noting that district court reason- ably may presume affected parties, which take no exception to an announced course of action, have no objection); see also Clemente ___ ____ ________ v. Carnicon-Puerto Rico Mgt. Assocs., 52 F.3d 383, 387 (1st Cir. _________________________________ 1995); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 913 ____________ _____________________ (1st Cir. 1989); Austin v. Unarco Indus., Inc., 705 F.2d 1, 15 ______ ____________________ (1st Cir.), cert. dismissed, 463 U.S. 1247 (1983). _____ _________ As the lawbooks bear out, in many respects this has been a groundbreaking mass-tort MDL from its onset in 1987. See, ___ e.g., supra n.1. The district court was confronted not only with ____ _____ 19 the daunting task of devising (sometimes from "whole cloth") mechanisms for streamlining case administration (e.g., the JDD), ____ but with establishing auxiliary administrative entities, includ- ing the PSC itself, which would permit adequate ongoing judicial oversight to be reserved for the most pressing and essential litigation. The PSC, IRPAs, and plaintiffs were indispensable partners in this important endeavor. Spurred by their respective self-interests, these broadly allied litigants were far better positioned than the trial judge to propose the prophylactic procedures believed necessary to protect their respective inter- ests from undue encroachment by potential adversaries, including one another. These complex and unwieldy "mass tort cases are a breed apart," Thirteen Appeals, 56 F.3d at 311, to the point that ________________ efficient, and often innovative, administrative arrangements become absolutely essential to enable the "court[] [to] run [a] tight ship[] to ensure that [the] litigation stays on course." Nineteen Appeals, 982 F.2d at 614. See In re Reticel Foam Corp. ________________ ___ _________________________ (In re San Juan Dupont Plaza Hotel Fire Litig.), 859 F.2d 1000, ______________________________________________ 1004 (1st Cir. 1988) ("In multi-party, multi-case litigation, the district court's success is largely dependent upon its ability to uncomplicate matters."). Trial judges newly immersed in mass- tort MDLs simply cannot reasonably be expected to anticipate, from the inception, all potential flaws in their unopposed procedural and administrative initiatives. It is essential, therefore, that counsel collaborate 20 with the trial judge from the outset in fashioning workable programmatic procedures, and thereafter alert the court in a timely manner as operating experience points up infirmities warranting further judicial attention. Absent this collaborative administrative monitoring, there inevitably remains an unaccept- able potential for internecine conflicts among the PSC, IRPAs and plaintiffs over their respective dormant claims to the common fund, which threaten to convert their cost-reimbursement disputes into wasteful satellite litigations. See Hensley v. Eckerhart, ___ _______ _________ 461 U.S. 424, 437 (1983) (cautioning that cost claims "should not [be allowed to] result in a second major litigation").  Even at the outset, while their primary focus remained on establishing defendants' liability, the PSC, IRPAs, and plain- tiffs surely could anticipate that their respective financial stakes in future PSC-cost reimbursement rulings would be substan- tial (e.g., $10 million, or 4 1/2 percent of common fund), ____ especially since the district court had authorized the PSC not only to take over certain IRPA litigation tasks but to establish and finance its own ad hoc law firm at a centralized and inevita- __ ___ bly costly adjunct office. Confronted with this serious poten- tial for conflicting self-interests, see Pretrial Order No. 2 ___ (cautioning counsel that "your working relationship will occa- sionally be strained, communication hampered, and mutual trust impeded"), and the virtually certain prospect that the massive litigation would be protracted, see id. (cautioning that counsel ___ ___ would "probably be laboring together [in strained relationships] 21 for several years"), the PSC, IRPAs, and plaintiffs were on reasonable notice from the outset that establishing adequate prophylactic procedures was a priority matter. Thus forewarned, the PSC, IRPAs, and plaintiffs all ___ were fairly alerted that the massive cost-submission documenta- tion generated over the years ahead would become critically important to them; viz., to satisfy the PSC's burden of proof ____ under Grendel's Den and enable both the IRPAs and plaintiffs to _____________ assert informed objections to inappropriate PSC cost-reimburse- ment submissions. Clearly, then, their timely fashioning of mutually satisfactory documentation and monitoring procedures offered the most reasonable prospect for forfending this satel- lite litigation. See Hensley, 461 U.S. at 437.  ___ _______ As appellants acknowledge that there are no legal precedents which provide detailed models for designing suitable mass-tort cost-reimbursement procedures, they now urge, after the fact, that we define the relevant responsibilities incumbent upon the district court and the PSC in these matters. We decline their request, however, in large part for the reason that the guidance presently available plainly runs counter to their premise that the primary responsibility for designing cost- submission procedures, ab initio, rests with the district court. __ ______ Although the Manual for Complex Litigation ("the MCL") ___ itself includes no detailed provisions on the subject, opting instead to encourage counsel for the principal parties to forge 22 ad hoc prophylactic procedures by mutual agreement from the __ ___ outset,8 it envisions that prescriptive procedural models will emerge, and deserving ones gain currency, through the litigants' own collaborative ad hoc initiatives, rather than originate in __ ___ appellate case law. See Pretrial Order No. 127, at 22 ("The ___ Manual for Complex Litigation . . . has been and will continue to  ____________________ 8The MCL provides, in relevant part: Expenses incurred and fees earned by designated counsel acting in that capacity should not be borne solely by their clients, but rather shared equitably by all benefiting from their services. If possible, the terms and procedures for payment should be established _____ ___ __________ by agreement among counsel, but subject to judicial _________ _____ _______ approval and control (see infra section 24.214, compen- ___ _____ sation for designated counsel). Whether or not agree- ment is reached, the judge has the authority to order reimbursement and compensation and the obligation to ensure that the amounts are reasonable. Terms and procedures should be established before substantial __________ ______ services are rendered and should provide for, among other things, the following: periodic billings during ________ ________ the litigation or creation of a fund through advance or ongoing assessments of members of the group; appropri- ate contributions from parties making partial settle- ments with respect to services already rendered by designated counsel; and contributions from parties in later filed or assigned cases who benefit from the earlier work of designated counsel. Designated counsel should render services as economically as possible under the circumstances, avoiding unnecessary activity and limiting the number of persons attending conferences and depositions and working on briefs and other tasks. The court should make clear at the first pretrial conference that com- pensation will not be approved for unnecessary or duplicative activities or services. The court should also inform counsel what records should be kept and when they should be submitted to the court to support applications to recover fees and expenses from copar- ties. See infra section 24.21, which discusses ground ___ _____ rules and record keeping where attorneys' fees are awarded by the court. MCL 20.223 (3d ed. 1995) (emphasis added).   ___ 23 be a primary reference text in this litigation. Counsel must become familiar with the Manual."). Furthermore, ex post facto __ ____ _____ pronouncements detailing model procedures would be particularly inappropriate in these circumstances as it is readily apparent that the present dispute sprang inexorably from the flawed proce- dural design in which appellants acquiesced from the outset, and for six years thereafter, to the point that its deficiencies became both systemic and irremediable. Appellants simply waited too long before asking the district court to undo, with their broad axe (viz., a 25% to 33% across-the-board cut), the documen- ____ tary muddle allowed to accumulate.  Moreover, pressed on many other fronts since 1987, it was not practicable for the district court alone to scrutinize all cost-related documentation maintained by the PSC for nearly half a decade. See Grendel's Den, 749 F.2d at 950 (noting that ___ _____________ courts must strive for cost-setting processes which are "not unnecessarily burdensome to the courts themselves"). Unlike less attenuated and complex litigation, mass-tort MDLs by their very nature predetermine that detailed monitoring of case-administra- tion-related responsibilities be delegated. The early pretrial orders entered by the district court, with appellants' acquies- cence, accordingly established a cost-monitoring regime which required the PSC to submit cost summaries every sixty days for interim approval by the court. The PSC-cost summaries, which _______ merely reflected total expenses by general type and category, represented the cumulative, edited product of the Raben and 24 Kevane "audits," without the underlying documentation. Thus, the interim-approval regime was reasonably designed to ensure that cost verification and containment by the parties not simply await an end to the entire litigation, by which time the accompanying avalanche of documentation would all but preclude cogent review.  Nevertheless, two serious deficiencies made their way into these interim-approval procedures with appellants' acquies- cence: (1) the failure to include defined criteria for assessing "reasonableness" and "necessariness"; and (2) the failure explic- itly to authorize or require appellants to monitor the underlying documentation as interim PSC-cost summaries were submitted to the district court.9 Thus, appellants settled from the outset simply for the broad, undefined general criteria that claimed-PSC costs be "necessary" and "reasonable," thereby implicitly foregoing such ongoing prophylactic measures as particularized monetary guidelines and/or ceilings on major cost categories; for example, maximum per diem rates for hotels and page-rates for photocopy- ing.10   ____________________ 9The record discloses no indication that appellants either objected to these deficiencies or proposed alternative proce- dures. See Silva v. Witschen, 19 F.3d 725, 729 n.4 (1st Cir. ___ _____ ________ 1994) (appellant bears brunt of failure to include pertinent material in record). 10The MCL notes: Rules and practices vary widely with respect to reimbursement of expenses incurred by lawyers in the course of the case out of a fee award. Charges for paralegals and law clerks at market rates and the fees of neces- sary experts are generally reimbursable. Sec- retarial assistance, on the other hand, is a 25 Yet more fundamentally, the pretrial procedural orders did not identify a minimum level of detail in the documentation required to substantiate that a particular PSC-member cost was "necessary" to a PSC litigation task and "reasonable" in amount. Rather, the orders simply directed the PSC to keep "careful, contemporaneous, detailed records" and provide "proper verifica- tion" of its expenditures. Although Grendel's Den makes clear _____________ that an entity requesting reimbursement must document its actual ______ expenditures, normally by itemized receipt, see 749 F.2d at 956- ____________ ___ 57, the more amorphous and subjective criteria for substantiating that a given expenditure was "necessary" and "reasonable" may not be so readily documented. For example, in some instances courts do not require exacting documentation even for major cost reim- bursements, such as overhead expenses incurred in connection with the PSC office, relying instead on their intimate knowledge of the litigation for determining whether entire categories of costs pass the reasonableness test; viz., whether the nature of the ____ expenditure strikes the court as clearly superfluous or its amount transcends the broad bounds of reasonableness in the  ____________________ normal part of overhead, but courts have differed over whether overtime is reimburs- able. Similarly, rulings vary on such items as copy and printing costs, certain meals and travel, and fax, telephone, and delivery charges. The determination of these kinds of claims should not be left to costly and time-consuming adversary adjudication at the end of the litigation; ground rules on reim- bursement should be established at the out- __ ___ ____ set. ___ MCL 24.215 (emphasis added).  ___ 26 circumstances.11 Furthermore, the early pretrial orders afforded both an obvious and ready opportunity for appellants, inter alios, to _____ _____ propose, with somewhat greater particularity at least, more definite contours for monitoring, testing, and verifying PSC compliance with the amorphous "necessariness" and "reasonable- ness" criteria laid down by the district court. As this litiga-  ____________________ 11The district courts differ quite sharply regarding the detail needed in cost-reimbursement submissions: The defendants next object that the plaintiffs' attor- neys have not documented their request for expenses with receipts. It is not necessary or desirable for federal courts to review receipts for every five dollar expenditure. Judges, being former practicing attor- neys, are quite capable of determining the reasonable- ness of expenses incurred during litigation. Neither is it necessary to itemize expenses in great detail. For example, it is sufficient that copying costs were submitted without listing how many pages of which docu- ments were copied during the three years of litigation. Law firms generally do not keep such records and little would be served by requiring them except to make liti- gation more expensive. The amount of the expenses submitted is certainly reasonable given the length and complexity of this case.  Duke v. Uniroyal Inc., 743 F. Supp. 1218, 1227 (E.D.N.C. 1990), ____ _____________ aff'd, 928 F.2d 1413 (4th Cir.), cert. denied, 502 U.S. 963 _____ _____ ______ (1991). See Laffey v. Northwest Airlines, Inc., 572 F. Supp. ___ ______ ________________________ 354, 383 (D.D.C. 1983) ("It is not necessary for plaintiffs to explain the purpose of every photocopy that is produced and every expenditure that is made in connection with the litigation. For most out-of-pocket costs, it is enough for the plaintiffs to identify the expenses by category, with a general description of the types of charges included in each category. In the case of particularly large or unusual expenditures, some additional explanation of the purpose of the expense may be necessary, but it is not the norm."), aff'd in pertinent part, 746 F.2d 4, 30 _____ __ _________ ____ (D.C. Cir. 1984), cert. denied, 472 U.S. 1021 (1985). But cf., _____ ______ ___ ___ e.g., Starnes v. Hill, 635 F. Supp. 1270, 1273 (W.D.N.C. 1986) ____ _______ ____ (requiring exquisite detail). 27 tion demonstrates all too well, the terms "detailed records" and "proper verification" though perhaps perfectly adequate benchmarks in a smaller, non-MDL litigation simply were not up to the task in this mass-tort MDL. See MCL 20.223 ("The court ___ ___ should also inform counsel what records should be kept . . . ."). For example, even though early pretrial orders forewarned that the litigation would be prolonged and that it would be impracti- cable for the PSC to submit all its underlying documentation ___ directly to the district court for interim-approval review, the PSC, IRPAs, and plaintiffs nonetheless refrained from proposing any further definition of the required level of documentary particularity. Thus, these matters were left unattended until the end of the litigation at their peril.  __ _____ _____ Moreover, appellants exacerbated the documentary muddle from the start by opting to forego ongoing monitoring of the PSC documentation. Unlike less prolonged and complex litigation, wherein interim-cost reimbursement claims may be deferable until the litigation nears completion, the hands-off approach taken by appellants is utterly impracticable in these large and enduring mass-tort proceedings. Given the potential for serious, long-term overreaching by the PSC under the relaxed regime envisioned by these pretrial orders, we discern no sound justification for appellants' failure to propose in 1987 that one of their own number be designated to __ ____ ___ __ _____ ___ ______ conduct closer review of the underlying PSC-cost documentation on 28 an ongoing basis.12 See Francis Bacon, Of Suspicion ("There is ___ __ _________ nothing makes a man suspect much, more than to know little."). Alternatively, the IRPAs could have sought district court autho- rization to retain an auditor to monitor these interim-cost reports on an ongoing basis for "necessariness" and "reasonable- ness." Thus, appellants' failure even to attempt interim moni- toring directly contributed to the serious and otherwise avoid- able consequences ultimately brought to the district court's attention at a time when corrective action could no longer be considered practicable. Nor are appellants absolved of their primary responsi- _______ _________ bility for protecting their own interests based on the mere fact ______ ___ __________ _____ ___ _________ that the pretrial orders did not explicitly direct interim monitoring. Rather, the record is clear that appellants were  ____________________ 12The PSC submitted its interim-cost claims under seal, presumably to preclude their perusal by "adverse" litigants (i.e., the defendants). In some attorney fee and cost shifting ____ __________ disputes, the requesting party may not wish to disclose its documentation to a party-opponent during the litigation, out of fear that its litigation strategies may be divulged, even though the party-opponent eventually may be liable for the fees or costs. See, e.g., Ring v. Commercial Union Ins. Co., 159 F.R.D. ___ ____ ____ _________________________ 653, 659-60 (M.D.N.C. 1995) (party-opponent barred from obtaining fee statements in circumstances where it could "examine the bill to find out the nature of the services in order to discover what advice the attorney was providing defendants and to learn other details about defendants' investigation of her claim"); Colonial ________ Gas Co. v. Aetna Cas. & Sur. Co., 144 F.R.D. 600, 607-08 (D. ________ ______________________ Mass. 1992) ("To the extent that time records and statements reveal the nature of the services provided, however, such docu- ments are privileged.").  Of course, these IRPAs and plaintiffs were not opposing parties in the underlying litigation. Thus, there was no privacy impediment to allowing them access to the PSC's interim materials and supporting documentation simply on request. In fact, the appellees note that their cost documentation was always accessi- ble to the IRPAs and plaintiffs on request. 29 neither precluded nor incapacitated from taking appropriate and timely precautions. First and foremost, fundamental deficiencies in the interim PSC-cost submissions to the court, especially their lack of particularity, readily could have been addressed and corrected ab initio, rather than at the end of the litiga- __ ______ tion. Second, appellants placed too much reliance upon non-MDL ___ case authority, see, e.g., Grendel's Den, supra, in failing to ___ ____ _____________ _____ conduct interim monitoring, based on their ill-advised assumption that the PSC's ultimate burden of proving its entitlement to reimbursement relieved appellants of their independent responsi- ________ __________ __ _____ ___________ _________ bility to collaborate with the district court and other parties ______ to develop and monitor appropriate cost-containment procedures.  30 Appellants were well aware, throughout the proceedings, that the PSC had not been directed to submit its voluminous cost documentation to the district court together with the interim summaries. Thus, appellants knowingly failed to assume their rightful responsibilities for safeguarding their own interests by monitoring interim PSC-cost submissions as required to ensure that the evolving documentation practices actually utilized by the PSC were equal to the task and, if not, to broach the matter first with the PSC and, as need be, with the court, in time to permit effective preventive and corrective measures before matters became completely unmanageable.13 We underscore the central administrative necessity in mass-tort MDLs, that the PSC, IRPAs, and plaintiffs attempt very early on to work out mutually acceptable procedures for document- ing and monitoring costs for which reimbursement is to be sought. No less importantly, both at the outset and thereafter, where cooperative efforts fail to produce agreement, or cost-benefit considerations independently warrant, judicial intervention  ____________________ 13For example, in 1993 Torres and Sterling were at logger- heads over whether the PSC cost-documentation records were adequate. Torres considered them an incomprehensible muddle. Sterling countered that the records were thoroughly organized at the outset but that Torres had "disorganized" them with his haphazard rummaging. The district court, after crediting Sterling's account, attempted to resolve the impasse by directing Torres and Sterling to meet and consult at the JDD. By then, ____ ___ _______ however, the damage had been done and the resultant adminis- trative "chaos" alluded to by the district court made it impossi- ble even to ascertain whether the PSC had maintained suitable documentation for the vast majority of its cost claims. With prudent ongoing monitoring by appellants from the outset, of course, the administrative confusion need never have gotten out of hand. 31 should be promptly sought before matters worsen or become irreme- diable. See Jaquette v. Black Hawk County, Iowa, 710 F.2d 455, ___ ________ ________________________ 463 (8th Cir. 1983) ("[T]he key to avoiding excessive costs . . . is early and stringent judicial management of the case.") (empha- _____ sis added). The individual plaintiffs and IRPAs have enough at stake in these matters to prompt their early intervention. For example, if overly particularized PSC-cost documentation on "reasonableness" and "necessariness" were to be required without regard to sound cost-benefit considerations, its unnecessary procedural costs ultimately would be borne by the individual plaintiffs. See Laffey v. Northwest Airlines, Inc., 572 F. Supp. ___ ______ ________________________ 354, 383 (D.D.C. 1983) ("Indeed, the amount of time that would be required to document each item of expense in the detail apparent- ly suggested by Defendant would be prohibitive; the compensable time required to generate the detail would exceed the expenses claimed."). Conversely, if appellants were to designate an IRPA, or retain an independent auditor, to monitor PSC-cost submis- sions, the expense conceivably could exceed whatever direct savings might be derived through any resulting cost-reimbursement disallowances. Thus, as the ultimate payors the individual plaintiffs and IRPAs have enough at stake to warrant reasonable efforts at ensuring that adequate documentation and cost-monitor- ing procedures also make cost-benefit sense.  An adequate cost containment and monitoring system in a mass-tort litigation cannot be economically and efficiently 32 designed and implemented from the outset absent a series of tradeoffs among the PSC, IRPAs, and plaintiffs, all of whom are under a mutual obligation to engage in an earnest effort to resolve their differences early on. These appellants, on the other hand, elected to acquiesce for four years in the flawed cost containment and monitoring system first set in place in 1987, awaiting an end to the principal litigation before coming forward with their objections. See Reilly, 863 F.2d at 160 ___ ______ (litigants share mutual burden to collaborate with district court in fashioning workable litigation procedures).  4. Evidence of PSC Overreaching 4. Evidence of PSC Overreaching ____________________________ Next we consider whether the PSC-cost reimbursements should be subjected to the across-the-board cuts (25% to 33%) urged by appellants notwithstanding their own failure to take appropriate preventive or corrective action. In our view, their crude cuts ought not be imposed in these circumstances absent evidence that the PSC acted in bad faith or took unfair advantage of the procedural deficiencies. Not only have we found no such evidence, but we can discern no appreciable PSC overreaching from the record. First, there should be no ready presumption that counsel appointed to the PSC expended its funds in bad faith; that is, with intent to inflate PSC-cost reimbursement submis- sions. This is especially true in the present circumstances, since the PSC members repeatedly attested that their cost submis- sions were bona fide. See, e.g., Alabama Power Co. v. Gorsuch, ___ ____ __________________ _______ 33 672 F.2d 1, 5 (D.C. Cir. 1982) ("[I]n most cases, the court should be content to rely upon the integrity of counsel, and allow the[] expenses [claimed]."); Greenspan v. Automobile Club _________ ________________ of Mich., 536 F. Supp. 411, 413-14 (E.D. Mich. 1992) (refusing to ________ "second-guess" necessariness of costs and relying in part on affidavits filed by requesting parties and their attorneys); cf. ___ also, e.g., In re Agent Orange Prod. Liab. Litig., 611 F. Supp. ____ ____ ______________________________________ at 1322 ("If there was doubt about the reason for a[n] [attorney's phone] call, it was allowed."); 28 U.S.C. 1924 (permitting attorneys to vouch for necessariness of costs). Whether or not there is a direct or formal attorney-client relationship between plaintiffs and the PSC, the PSC and its IRPA members necessarily owed a fiduciary obligation to the plain- tiffs. Cf. In re Agent Orange Prod. Liab. Litig., 818 F.2d at 223 ___ _____________________________________ (noting that lead counsel owes fiduciary duty to class plain- tiffs); see also MCL 20.22 (counseling court to remind PSC ___ ____ ___ members of "their responsibility to the court and their obliga- tion to act fairly, efficiently, and economically in the inter- ests of all parties and their counsel"). Furthermore, these PSC members simultaneously were acting in their respective roles as IRPAs, with direct professional responsibility for representing approximately seventy percent of the plaintiff class. In these circumstances especially, given their professional obligations to the court and their individual clients, we would be highly reluctant to suppose that the PSC members promoted overreaching by the PSC. 34 Second, the PSC "auditing" which did occur, whether or not adequate, cannot be dismissed as perfunctory, since it did screen out some significant cost excesses. For example, Adamina Soto attested that she contacted PSC members concerning problem expenses and followed up with requests for further documentation. Indeed, the Raben and Soto audits resulted in cost reductions exceeding $346,000. Although appellants object that some PSC auditing was conducted at random, particularly that performed by Kevane and Soto, as it did not purport to verify each expense claim, the reviews conducted by Raben and Sterling were not random. Finally, even the random "audit" procedures were not conducted under PSC control. Thus, we are not persuaded that the _____ ___ _______ random review procedures were flawed to the point that they could provide no effective deterrent to substantial PSC overreaching.  Third, appellants emphasize that Kevane and Raben were accountants, with little personal knowledge regarding the precise litigation tasks assigned to the PSC. Both were professional CPAs, however, and Raben in particular was no neophyte, having been responsible for comparable cost oversight in the MGM case, itself a hotel fire litigation. It does not seem unreasonable, therefore, absent evidence to the contrary, to expect that Raben was reasonably qualified for the professional task assigned to him. Fourth, as there is no indication in the appellate record that the PSC ever attempted to prevent appellants from examining its underlying cost documentation prior to 1991, the 35 reasonably foreseeable prospect that appellants might well (indeed should) have requested interim access to the documenta- tion presumably had some deterrent effect upon PSC overreaching. Not only did the pretrial orders not preclude ongoing access by appellants to the PSC documentation, but there would appear to have been no conflict of interest or "work product" privilege which would have prevented the individual plaintiffs or IRPAs from inspecting the PSC documentation at any time during the litigation. See supra note 12.14  ___ _____ Finally, and most importantly, the district court initially proposed to limit PSC attorney fees and costs, com- ____ bined, to ten percent of the eventual common fund, thus providing _____ PSC members a substantial inducement to exert reasonable efforts to minimize PSC costs with a view to preserving a larger balance with which to fund their attorney fees as PSC members. See In re ___ _____ Wells Fargo Sec. Litig., 157 F.R.D. 467, 470 (N.D. Cal. 1994) ________________________ ("[A]n attorney generally has no incentive to minimize litigation expenses unless his fee award is inversely related to such expenses."). Appellants respond that the ten percent ceiling did not deter inflated costs, however, because the district court  ____________________ 14Appellants point out that the PSC refused Torres access to certain "derivative" documents after 1991, such as the Raben work papers. Nevertheless, Torres had access to the raw materials examined by Raben (viz., actual PSC receipts and other documenta- ____ tion). Moreover, appellants were not necessarily entitled to full-fledged discovery, at least absent district court authori- zation. See Thirteen Appeals, 56 F.3d at 303 (noting that ___ _________________ normally it is sufficient, for purposes of a fee and expense application, to order exchange of the "raw materials" or "all the data reasonably necessary to formulate . . . objections") (cita- tion omitted).  36 announced in January 1991 that it would not be enforced after all. See Thirteen Appeals, 56 F.3d at 307 n.10 (holding that ___ ________________ tentative cap was not binding on district court); Nineteen ________ Appeals, 982 F.2d at 612 (same). Nevertheless, until January _______ 1991, by which time the lion's share of its $10 million in costs ______ _____ had accrued, the PSC could not have known that the district court would discard the ten percent ceiling. We therefore conclude, based on the foregoing consider- ations, particularly the absence of reliable evidence of over- reaching or bad faith on the part of the PSC, that it would be inequitable to resort to the crude cost-cutting bludgeon proposed by appellants, who share at least equal responsibility for these procedural lapses. Although the procedural deficiencies dis- cussed above may have led to some unnecessary or unreasonable expenditures, appellants clearly failed to alert the district court until it had become impracticable either to prevent or assess, let alone correct them in any reliable or cost-effective manner. B. Individualized Objections B. Individualized Objections _________________________ Next we consider appellants' objections to particular categories of cost-reimbursement claims.15  ____________________ 15We see no need to catalog certain meritless challenges appellants raise to various miscellaneous expenses, especially in light of the deferential standard of review. See Order No. 584 ___ (Aug. 29, 1995). We note simply that our review has disclosed no abuse of discretion in these regards.  37 1. PSC-Office Costs16  1. PSC-Office Costs ________________ Appellants contend that the $913,503 fee paid to Attorney Thomas H. Foulds by the PSC for services rendered as a putative "insurance expert" should not have been treated as a PSC-office cost, see Order No. 520 (Jan. 28, 1994), but as an ___ attorney fee chargeable against the fifty percent share of the attorney-fee fund already recovered by PSC members. The district court determined that Foulds, who had worked for twenty years as an insurance claims manager before attending law school, had been hired not as an attorney, but primarily to consult with PSC attorneys regarding the nuts-and-bolts interpretation of various insurance policies. The PSC concedes that Foulds handled certain litigation tasks normally performed by attorneys (e.g., deposi- ____ tions in the liability case against defendant Alexander and Alexander), but nonetheless insists that this was the most cost- efficient approach, especially given Foulds' intimate under- standing of the pertinent insurance policies.17 Although the parties cite no authority regarding the appropriate criteria for  ____________________ 16Appellants likewise attack the district court determina- tion that they waived objection to any PSC-office costs other than the Foulds fee. We need not resolve the issue, however, since appellants' objections to these cost-reimbursement claims are based on their contention that the PSC failed to meet its burden of proof and verification under Grendel's Den, a position _____________ which we have already rejected. See supra Section II.A; see also ___ _____ ___ ____ In re Agent Orange Prod. Liab. Litig., 611 F. Supp. at 1331 _________________________________________ (allowing "[a]ll reasonable, verifiable expenses for running" the PMC's centralized office).  17The PSC also protests that it came as no "surprise" to appellants that Foulds was retained. But this is beside the point. Appellants simply maintain that they were never informed that Foulds would be used as an "attorney."  38 determining whether one in Foulds' position should be considered an insurance expert or an attorney, we are persuaded that the district court ruling constituted error in these particular circumstances.18 As a general rule, a PSC member who serves simulta- neously as an IRPA in a mass-tort MDL is entitled to recover separate compensation from the common fund for the legal services performed in each distinctive role. See Thirteen Appeals, 56 ____ ___ ________________ F.3d at 300 n.2. The prospect of more lucrative returns for their services prompted many IRPAs to compete for these coveted PSC appointments in 1987, respectively urging upon the district court their particular experience and expertise in previous mass- tort suits. See Nineteen Appeals, 982 F.2d at 605 ("[A]ppointment ___ ________________ to the PSC was much coveted . . . ."). On the other hand, all the unsuccessful IRPA candidates for PSC appointment must nevertheless contribute toward defraying PSC attorney fees/costs, since the district court's decision to establish a PSC diverts a significant portion of their respective  ____________________ 18The applicable standard of review is not clear and we find no controlling precedent. Nonetheless, the basic determination as to what work Foulds performed would call for fact-finding, reviewable only for clear error. See Damon v. Sun Co., Inc., 87 ___ _____ _____________ F.3d 1467, 1483 (1st Cir.1996). In this case, however, the parties agree as to what work Foulds performed. On the other hand, the determination as to which fund attorney fee or cost should bear the expense incurred for a particular type of service, would appear to be a legal question, or a mixed question in which the legal component predominates, either of which normally would be reviewed de novo. As we are persuaded that the __ ____ district court ruling cannot withstand review under either standard, we need not determine the precise standard at this  juncture. 39 contingent fees toward funding the PSC. Cf. id. at 310 (noting ___ ___ that though the PSC may be "a necessary concomitant to skillful case management of mass tort suits, it nevertheless significantly interferes with [the respective IRPAs'] expectations regarding the fees that his or her client has agreed to pay"). According- ly, due regard should be had for these nonmember-IRPAs' dimin- ished fee expectations, at least to the extent that "the judge . . . attempt to avoid any perception of favoritism" in mediating disputes between PSC members and nonmember IRPAs. See Nineteen ___ ________ Appeals, 982 F.2d at 605.  _______ At the time the nine original PSC members were appoint- ed, from among forty applicants, the district court expressly directed, inter alia, that the PSC "shall neither be enlarged nor _____ ____ diminished in size or membership without Court approval," Pretri- al Order No. 127, at 29, that the PSC "conduct all pretrial liability and damage discovery," id. at 30, and that "only two ___ members of the PSC, or counsel duly authorized by them, may question [] deponent[s]," id. Given the acknowledgement by the ___ appellees that Foulds, on occasion, served as a de facto PSC __ _____ attorney without prior district court authorization, his reten- tion, to that extent at least, directly contravened the explicit pretrial orders prohibiting any de facto expansion of PSC member- __ _____ ship. Thus, the district court's subsequent authorization of reimbursement to the PSC for the Foulds fee as an insurance expert cannot cure the PSC's unauthorized, unilateral expansion of its attorney ranks, without inviting similar circumventions in 40 the future. We therefore reject the suggestion that we remand to permit the district court to apportion the $913,503 fee as between the "insurance expert" and "attorney" services performed by Foulds. We wish to make clear, however, that the PSC was not precluded from retaining Foulds based on a reasonable belief that he was the best qualified insurance expert available, simply because he happened to be an attorney. Nonetheless, once the PSC did retain Foulds, it owed nonmember IRPAs a duty of fair dealing to ensure that he undertook no unauthorized "attorney" tasks which might have been performed by some disappointed candidate for PSC membership.  2. PSC-Member Costs  2. PSC-Member Costs  ________________ a) Photocopying Costs a) Photocopying Costs __________________ Appellants oppose the twenty-five-cent page rate at which the district court permitted reimbursement to PSC members for photocopying; in all, amounting to $184,000. The district court explained that it "fail[ed] to see the difference between PSC members and any IRPA charging a client a reasonable amount for copying charges." Order No. 510-A, at 8 (Nov. 24, 1993). Appellants cite numerous decisions which hold the twenty-five- cent rate unreasonable, and argue that the PSC provided no proof that it actually incurred that cost to copy each page.  The PSC members offer three justifications for the approved rate. First, most photocopying was done at the PSC office and no reimbursement claim was made. Second, appellants 41 knew early on in the litigation that the PSC had voted to permit its members to claim reimbursement at twenty-five cents per page. Third, the twenty-five-cent rate, standard in many law offices, had been allowed in the MGM case. Although the district court's cost-allowance rulings are entitled to deferential review, Grendel's Den, 749 F.2d at 950, we are persuaded that its ruling _____________ does not withstand scrutiny. Unlike the PSC, the IRPAs are free to assess their own clients for photocopying in accordance with their respective contingent fee agreements and any applicable ethical-code provi- sion. On the other hand, the PSC is a creature of the district court, whose mission is to promote more efficient litigation, see ___ MCL 20.223 ("Designated counsel should render services as ___ economically as possible under the circumstances."). In a "common benefit" case of this sort, therefore, the court must ensure that PSC members recover only their actual costs, with no ______ "profit" margin. See Fogleman v. Aramco, 920 F.2d 278, 286 (5th ___ ________ ______ Cir. 1991) ("To the extent that counsel charges a party more than actual cost for any service, be it reproduction of documents or telephone calls, counsel is recovering additional fees."); Spicer ______ v. Chicago Bd. Options Exch., Inc., 844 F. Supp. 1226, 1260 (N.D. _______________________________ Ill. 1993); In re Washington Pub. Power Supply Sys. Sec. Litig., ___________________________________________________ 779 F. Supp. 1063, 1111-12 (D. Ariz. 1990) (reducing in-house photocopying costs claimed at twenty or twenty-five cents: "[t]hat this amount may be charged to regular clients by the firm, or that it is 'standard' in the firm's area of practice, is 42 not controlling, [and] Class members will not be assessed an amount that produces a clear and unwarranted profit for the firm"), rev'd on other grounds, 19 F.3d 1306 (9th Cir. 1994).19  _____ __ _____ _______ Unlike the PSC's alleged failure to document the "necessariness" and "reasonableness" of other types of expenses (e.g., hotel charges, air fares), see supra Section II.A, its ____ ___ _____ failure to document its own in-house photocopying costs presents a fundamental problem. As in-house photocopying costs are not incurred with "outside" providers (e.g., hotel, airline, or even ____ an outside photocopying service), there is no third-party receipt to verify the expenditure and its amount.20  ____________________ 19See also ABA Comm. on Ethics and Professional Responsibil- ___ ____ ity, Formal Op. 379 (1993) (noting that counsel is "obliged to charge the client no more than the direct cost associated with the service (i.e., the actual cost of making a copy on the ____ photocopy machine) plus a reasonable allocation of overhead expenses directly associated with the provision of the service (e.g., the salary of a photocopy machine operator)"); id. ("[I]t ____ ___ is impermissible for a lawyer to create an additional source of profit for the law firm beyond that which is contained in the provision of professional services themselves. The lawyer's stock in trade is the sale of legal services, not photocopy paper, tuna fish sandwiches, computer time or messenger services."); cf. ___ Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, _____________________ ________________________ 1050 (2d Cir. 1973) (counsel in class actions "serve[] in some- thing of a position of public trust . . . [and] share[] with the court the burden of protecting the class action device against public apprehensions that it encourages . . . excessive attorneys' fees). 20See In re Motor Freight Express, 80 B.R. 44 (Bankr. E.D. ___ ____________________________ Pa. 1987)) ("In the case of photocopying, counsel should inform the Court of the number of copies, the cost of each copy, and provide, if possible, a breakdown of the reasons why photocopying of certain documents was necessary."); In re Old South Transp. ________________________ Co., 134 B.R. 660, 667 (Bankr. M.D. Ala. 1991) (same); cf. ___ ___ Berryman v. Hofbauer, 161 F.R.D. 341, 344 (E.D. Mich. 1995) ________ ________ (noting that, under 28 U.S.C. 1920, cost-reimbursement claimant's conclusory statement that copying costs were necessary is insufficient). 43 Even if only by reasoned approximation, therefore, the PSC needed either to demonstrate the various components of its in-house photocopying costs (e.g., the prorated cost of purchas- ____ ing or leasing the photocopier, the copy paper, and salaries attributable to making the copies), or show the prevailing cost of comparable outside copy services, see, e.g., Haroco, Inc. v. ___ ____ ____________ American Nat'l Bank and Trust Co. of Chicago, 38 F.3d 1429, 1441 _____________________________________________ (7th Cir. 1994) (holding that "charges for in-house reproduction may not exceed the charges of an outside print shop"). See ___ Grendel's Den, 749 F.2d at 950 (noting that the district court's ______________ discretion "must, of course, be exercised within evidentiary bounds," and the court must "provide a 'clear explanation of its reasons for the fee award'").  44 The PSC does not pretend to have established that it actually incurred a twenty-five-cent-per-page photocopying cost. ________ ________ As all three PSC justifications for the requested twenty-five- cent rate, supra, are inapposite to this essential showing, we _____ vacate the district court ruling, and direct the PSC members to reimburse appellants for all PSC in-house photocopying cost claims calculated at a rate exceeding ten cents per page. Thus, appellees are to remit $110,400 of the $184,000 disbursed to the PSC. b) Hotel Rates b) Hotel Rates ___________ Lastly, appellants contend that the district court abused its discretion by allowing reimbursement to various PSC members for hotel-room charges ranging from $180 to $450 per day, notwithstanding its pretrial order cautioning that "hotel accom- modations/meals should be moderate, not deluxe . . . ." Pretrial Order No. 127, at 44-45. Appellants assert that any hotel-room charge above the $116 per diem rate then deemed deductible by the Internal Revenue Service, should not have been reimbursed, that less expensive rooms were available in Puerto Rico, and that on occasion PSC members obtained less expensive rates. There was no abuse of discretion. First, the district court correctly noted that substan- tial leeway was due PSC members regarding their scheduling needs during the frenetic early stages of the litigation, when most investigation and discovery had to be conducted. See Order No. ___ 584, at 9 (noting that the PSC conducted over 2300 depositions, 45 and retained twenty-nine expert witnesses); id. ("[The investi- ___ gative] stage was decisive in terms of immediately preserving evidence and conducting valuable investigations regarding the fire origin and spread. Time was of the essence and because of this, the activity was feverish, leaving scant opportunity to fine-tune the preparation and justification of expenses."). Consequently, the appropriate inquiry here is not simply whether an individual attorney might have booked a room at a lower rate during a given time period. Rather, the PSC frequently was required to coordinate lodging for many individuals and without much advance notice. Thus, the appropriate inquiry must be whether the rate was reasonable in relation to the legitimate needs occasioned by the litigation tasks at hand. Against this backdrop, appellants have failed to demonstrate an abuse of discretion. None of the hotel rates strike us as facially abusive in these particular circumstances. Cf. Grendel's Den, 749 F.2d at 957 (finding abuse ___ _____________ of discretion where hotel bill of $917 could be considered "unreasonable on its face").  Second, as with other PSC-costs, see supra Section ___ _____ II.A, appellants settled, from the outset and without protest, for amorphous general standards, such as "moderate" and non- "deluxe" hotel accommodations, whereas they were free from the start to propose the $116 per-diem rate they now suggest. _______ Furthermore, there has been no showing that the hotel charges for which reimbursement was sought were either "deluxe" or not 46 "moderate" in the circumstances.21 Finally, as concerns __ ___ _____________ appellants' contention that PSC members did not keep adequate supporting documentation relating to the "necessariness" and "reasonableness" of each hotel expense, their position is fore- closed. See supra Section II.A.  ___ _____ III III CONCLUSION CONCLUSION __________ We acknowledge the rational force in appellants' contention that inherent conflicts of interest exist between the PSC and individual plaintiffs in mass-tort MDLs, yet serious deficiencies in the cost-submission procedures nevertheless persisted throughout this litigation. Nonetheless, despite reasonable notice of the obvious peril to their own financial interests, and their clear obligation to forfend against it from the outset, appellants did not turn serious attention to the PSC- cost reimbursement regime deficiencies until the Gordian knot could no longer be undone. Consequently, we determine, as we must, that the requested relief has been rendered impracticable, through appellants' inaction, to the extent that further redress at this point would extend this satellite litigation for no cost- effective purpose. See Hensley, 461 U.S. at 437.  ___ _______ Accordingly, within 30 days, appellees shall remit to Accordingly, within 30 days, appellees shall remit to the Clerk of the United States District Court for the District of the Clerk of the United States District Court for the District of  ____________________ 21With respect to the $450 per diem rate, the district court supportably made the specific finding that the room in question was a suite, shared by several members and situated near facili- ties necessary to the litigation tasks to be performed. 47 Puerto Rico $1,023,903 (consisting of the $913,503 previously Puerto Rico $1,023,903 (consisting of the $913,503 previously received as reimbursement for PSC costs incurred for services received as reimbursement for PSC costs incurred for services rendered by Mr. Foulds and the $110,400 for the PSC-Member rendered by Mr. Foulds and the $110,400 for the PSC-Member photocopying costs), plus interest calculated at the legal rate photocopying costs), plus interest calculated at the legal rate (6% per annum), P.R. Laws Ann. tit. 31, 3025, from the dates of (6% per annum), P.R. Laws Ann. tit. 31, 3025, from the dates of the respective disbursements to the PSC from the litigation the respective disbursements to the PSC from the litigation expense fund established in Pretrial Order No. 127. In due expense fund established in Pretrial Order No. 127. In due course, the Clerk shall distribute the remitted funds to those course, the Clerk shall distribute the remitted funds to those plaintiffs who prosecuted the instant appeal, in equal shares. plaintiffs who prosecuted the instant appeal, in equal shares. In turn, these plaintiffs shall pay their respective IRPAs In turn, these plaintiffs shall pay their respective IRPAs whatever share of the rebated funds (if any) may be due the IRPAs whatever share of the rebated funds (if any) may be due the IRPAs under their respective contingent fee contracts for services under their respective contingent fee contracts for services rendered in prosecuting this appeal. In all other respects, the rendered in prosecuting this appeal. In all other respects, the district court order is affirmed. The parties shall bear their district court order is affirmed. The parties shall bear their own costs on appeal. SO ORDERED. own costs on appeal. SO ORDERED. __ _______ 48